IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | |
|---|---|
| CARLOS PÉREZ-COTAPOS UGARTE, MARIA ISABEL URETA BAZÁN, CARLOS PÉREZ-COTAPOS SUBERCASEAUX, INVERSIONES ANE MIREN LIMITADA, SHERYL GROVE, and HOORIEH ALAGHEMAND, Individually and On Behalf of All Others Similarly Situated, <br><br> *Plaintiffs*, <br><br> v. <br><br> CASSAVA SCIENCES, INC., RICHARD JON BARRY, JAMES W. KUPIEC, REMI BARBIER, LINDSAY BURNS, and ERIC SCHOEN, <br><br> *Defendants*. | Case No. 1:24-CV-01525-DAE |

**DEFENDANTS CASSAVA SCIENCES INC.'S, RICHARD JON BARRY'S, JAMES W. KUPIEC'S, AND ERIC SCHOEN'S REPLY BRIEF IN SUPPORT OF THEIR MOTION TO DISMISS PLAINTIFFS' AMENDED COMPLAINT**

Plaintiffs' Opposition (ECF 76, "Opp.") confirms that Plaintiffs' Amended Complaint is a recycled storyline from an existing consolidated class action against Cassava. Plaintiffs' only additional allegations are that Defendants made a handful of representations that, while perhaps true, did not do enough in Plaintiffs' view to inform investors of the possibility of research misconduct. Such ill-founded and implausible allegations are not sufficient to state a securities fraud claim.

Indeed, Plaintiffs' Opposition further confirms that the Amended Complaint does not identify any false statements. Instead, Plaintiffs manufacture a narrative spinning factually accurate statements as "misleading" by pointing to (1) unsupported assumptions about how investors would interpret Defendants' statements beyond the words Defendants used; (2) baseless assertions about what Defendants should have known or should have told investors, untethered to contemporaneous facts; and (3) improper use of hindsight—treating later, often unrelated developments as proof that Defendants' earlier, accurate statements must have been fraudulent.

This is not how § 10(b) claims work. The PSLRA requires Plaintiffs to specify each misleading statement, plead with particularity why it was false or misleading when made, plead facts giving rise to a strong inference of scienter, and plead facts showing that the fraud caused the Plaintiffs' loss. *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 321–24 (2007); *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 342–47 (2005). Plaintiffs' Amended Complaint pleads at most "ordinary negligence" and "corporate trauma" untethered to any allegedly misleading statement made by Defendants; that "does not constitute securities fraud." *Handal v. Innovative Indus. Props., Inc.*, 157 F.4th 279, 286 (3d Cir. 2025).

## A.    Plaintiffs Fail to Identify Any Actionable Misrepresentation or Omission

Plaintiffs' Amended Complaint fails to identify a single actionable misstatement or omission. ECF 70 at 10–19. Plaintiffs' Opposition attempts to recast Defendants' arguments as

1

invoking a "literal truth" safe harbor. That is a strawman. Defendants' point is straightforward: Plaintiffs must plead an actionable misrepresentation—a statement that, read fairly and in context, created a materially false impression. *Ind. Elec. Workers' Pension Tr. Fund IBEW v. Shaw Grp., Inc.*, 537 F.3d 527, 541 (5th Cir. 2008). They do not.

### 1.    Statements About Investigations and Phase 2b Results Were Not Misleading

The Amended Complaint does not allege that Cassava's supposed misstatements were actually false. It does not say that Cassava mischaracterized the publicly-available CUNY report; that any government agency told Cassava it found evidence of wrongdoing by the Company or its employees before July 2024; that Orrick found evidence of misconduct by Cassava or its employees; or that Phase 2b results were inaccurately reported. Instead, Plaintiffs rely on a two-step gambit. First, they assert—without support—that a "reasonable investor" would read Defendants' statements as sweeping declarations that no one involved in simufilam's development ever engaged in research misconduct. *See* Opp. at 5–10. Second, they argue those statements were misleading because Defendants "knew or recklessly disregarded" alleged "evidence" of misconduct. *Id.* at 16–20. This theory fails at both steps.

> a.    *Plaintiffs cannot plead falsity by attributing sweeping inferences to precise disclosures.*

Plaintiffs argue that the statements they challenge would have led "a reasonable investor" to believe "that there was no evidence of research misconduct." Opp. at 7–8. But Defendants never made such sweeping assurances. To the contrary, Defendants' statements were narrow, accurate, and properly cabined. For instance, Cassava's statements about the CUNY Report accurately described what the report, which was publicly available, did and did not do. Cassava noted that CUNY did not interview Cassava employees, made no findings of data manipulation, and

2

identified serious deficiencies in Dr. Wang's recordkeeping and documentation. *See* Am. Compl. ¶¶ 79, 80, 123. Those statements neither state nor imply that all allegations were meritless.

Similarly, Cassava's disclosures stating that no government agency had informed Cassava it found evidence of wrongdoing by the Company or its personnel, and that no charges had been filed, accurately reported the status quo. Those same disclosures warned that the investigations were ongoing, that outcomes were uncertain, and that enforcement actions could still be pursued against the Company "or others." *See id*. ¶¶ 73, 125, 127, 132. Plaintiffs must rewrite these disclosures to transform them into assurances that no misconduct or charges were possible.

Plaintiffs engage in the same recharacterization for Cassava's disclosure that Orrick's investigation "found no evidence to substantiate allegations that the Company or its employees engaged in or were aware of research misconduct." *See id.* ¶¶ 129, 130. That statement accurately reported counsel's conclusion based on its investigation; it was not a guarantee that critics would agree or that no competing narrative could be advanced. On the contrary, criticisms and public disputes over simufilam and the Phase 2b Study were well known and ongoing at the time.

    b.  *Plaintiffs' alleged "evidence" does not establish that Defendants "knew or recklessly disregarded" evidence supporting research misconduct.*

Plaintiffs contend that Defendants "knew or recklessly disregarded" evidence of research misconduct, but the only items they identify are (1) Cassava's 2022 audit of Dr. Wang's laboratory, (2) a May 2020 email from Dr. Burns to Dr. Wang, and (3) alleged exclusions from Phase 2b cognition analyses. None of this evidence supports a plausible claim of misconduct, knowledge of misconduct, or severe recklessness.

Cassava's 2022 audit identified deficiencies in documentation practices, access controls, and quality management at Dr. Wang's laboratory, *see* Am. Compl. ¶¶ 77, 78, 203—findings *entirely consistent* with Cassava's description of the CUNY Report's findings, *see id.* ¶¶ 80, 123—

which similarly reflected concerns about poor recordkeeping and laboratory control, not evidence of data fabrication or manipulation.

The May 2020 email from Dr. Burns is no better. Plaintiffs argue that Dr. Burns "emailed Dr. Wang on May 14, 2020 sufficient information to unblind himself as to some Phase 2b Study participants," Opp. at 2, precisely what Cassava disclosed on July 1, 2024, promptly after it learned that information during discussions with the SEC, Am. Compl. ¶ 141. Plaintiffs do not allege that Dr. Wang was in fact unblinded or that Dr. Burns' email actually compromised any data integrity. Plaintiffs cannot even plausibly allege that Defendants were contemporaneously aware that Dr. Wang could theoretically use the attachment to partially unblind himself. No regulator has ever charged Dr. Burns with knowingly enabling unblinding or intentionally engaging in misconduct. To the contrary, Plaintiffs cite nothing more than an SEC allegation of negligence, *see id.* at ¶ 154, which does not support a plausible inference of knowing or reckless fraud.

Nor do Plaintiffs' allegations about patient exclusions from Phase 2b cognition analyses establish intentional misconduct. *See, e.g., id.* ¶ 124. Plaintiffs do not allege that Dr. Burns excluded Phase 2b patients to fabricate or falsify cognition results, or that the reported Phase 2b cognition data were inaccurate; rather, they contend that certain exclusions were improper and again rely only on an SEC allegation of *negligence. See id.* at ¶ 154.

Taken together, these allegations amount to speculation layered on hindsight, not particularized facts showing misconduct, contemporaneous knowledge, or severe recklessness. Even if Defendants were aware of this information, it does not follow that they knew of "evidence supporting accusations of research misconduct" or facts rendering their disclosures misleading.[1]

---

[1] Plaintiffs "dispute[] that Orrick could have possibly found no evidence of research misconduct" because "[a]ny reasonable investigation would have uncovered" such evidence "given that the investigation was on the heels of the widely publicize accusations of research misconduct." *Id.* at

Plaintiffs cannot plead securities fraud by speculating that investors drew overly optimistic inferences from accurate, specific disclosures that Plaintiffs—years later—say were unwarranted due to their (mis)characterization of "evidence."

**2.    Defendants' Statements About the Phase 2 Open Label Results Were Not Misleading**

Plaintiffs' attack on Cassava's Phase 2 open-label disclosures is a disagreement over statistical methodology, not evidence of a false or misleading statement. Plaintiffs argue Defendants' statements about the Phase 2 open-label results were misleading because Defendants analyzed certain patient cohorts rather than the full ITT population, allegedly contrary to ICH E9 standards, and failed to announce that the results therefore had "limited probative value." Opp. at 10–13. This does not support a securities fraud claim.

First, Plaintiffs do not identify a single inaccurate factual statement. They concede Defendants disclosed the precise cohort sizes the results derived from ("n=47," "n=40," "n=32") and do not allege that those figures were inaccurate. Am. Compl. ¶¶ 99, 160, 162–164. Their complaint is that Defendants did not additionally convert those disclosed numbers into Plaintiffs' preferred statistic—namely, that the cohorts represented "roughly 53%" of the ITT population. *Id.* ¶ 165. That figure is Plaintiffs' own calculation, not a fact Defendants misstated or concealed.

Second, there is no inconsistency—let alone falsity—between describing the Phase 2 analysis population as patients with "baseline and at least one post-baseline assessment," and reporting outcomes measured at Month 24 from those patients who completed a Month 24 assessment. Opp. at 11. Plaintiffs do not allege that Defendants ever claimed to analyze Month 24

8–9. This assertion is wrong (the investigation found no such evidence). But Plaintiffs' argument also defeats itself. If the public accusations were so pervasive and compelling that no reasonable investigator could possibly reach Orrick's conclusion, certainly no reasonable investor could have read the disclosure of Orrick's conclusion as definitive.

outcomes for patients who lacked Month 24 data. Instead, they argue that the earlier description of the analysis population was misleading because later analyses applied more specific inclusion criteria. *See id.* But a description of the broader Full Analysis Set does not become misleading because a later, time-specific analysis necessarily includes only patients with data at that timepoint.

Third, Plaintiffs' reliance on ICH E9 likewise does not establish falsity. Plaintiffs do not allege Defendants falsely claimed they conducted an ITT analysis or complied with ICH E9 standards. Nor do they allege that Defendants promised Phase 3–style statistical rigor for a Phase 2 open-label safety study. Disagreement over preferred methodology does not render disclosed results false or misleading.

Fourth, Plaintiffs' contention that investors cannot be expected to interpret medical or statistical data fares no better. *See id.* at 12. Reasonable investors are capable of reading disclosed data in context, especially when it is central to the business they invested in. Cassava is a clinical-stage biopharmaceutical company with a single drug candidate. Reasonably informed investors in such a company necessarily evaluate clinical trial disclosures, study design, and reported data. Defendants accurately disclosed cohort sizes and observed outcomes, and expressly disclosed the open-label nature of the study and its limitations. Cassava was not required to also translate disclosed data into every conceivable derivative statistic, adopt Plaintiffs' preferred interpretive framework, or editorialize that reported results should be discounted for alleged bias.[2]

### 3. Defendants' Statements About Mr. Barbier's and Dr. Burns's Departures from Cassava Were Not Misleading

---

[2] Similarly, Plaintiffs' attempt to recast qualitative characterizations—such as "remarkable" or "unlike any Alzheimer's trial ever"—as actionable misstatements fails. The reported outcomes are verifiable facts, which Plaintiffs do not allege were misstated. The remainder reflects evaluative judgment about clinical significance that a reasonable investor could evaluate.

Plaintiffs' allegations that Cassava misrepresented the departures of Mr. Barbier and Dr. Burns rests entirely on hindsight and inference, not on any pleaded false statement or actionable omission. *See* Opp. at 13–14. First, Plaintiffs identify no inaccurate statement. Cassava disclosed that Mr. Barbier resigned "other than for cause" and not due to a "disagreement" with the Company. This is true, and Plaintiffs do not allege facts to the contrary. Instead, they argue that because later enforcement actions implicated Dr. Burns and Mr. Barbier, the disclosure must have omitted something. That is classic fraud-by-hindsight and insufficient to state a claim.

Second, Plaintiffs improperly recast the absence of disclosures about the details of confidential, unresolved investigations as an actionable omission. But Cassava was not required to speculate about potential charges, disclose internal investigative details, or publicly attribute misconduct to departing executives. The duty to "speak the full truth" requires only that statements made not be rendered misleading by omission of concrete, contemporaneous facts.

**B.      Plaintiffs Do Not Plausibly Allege a Strong Inference of Scienter**

Plaintiffs' Opposition misstates the scienter standard and improperly stacks inferences to obscure the Amended Complaint's failure: It does not plead particularized facts giving rise to a strong inference that any Defendant acted with intent to deceive or severe recklessness. While scienter must be assessed holistically, *Tellabs* requires courts to weigh competing inferences and determine whether the inference of scienter *is at least as compelling as non-fraudulent explanations*. 551 U.S. at 323–24. Plaintiffs' Amended Complaint fails that test.

First, the PSLRA forecloses liability based on "should have known" pleading untethered to contemporaneous facts. As explained, Plaintiffs' assertion that Defendants "knew or should have known" that "evidence of research misconduct" rendered their accurate disclosures misleading relies on unsupported assertions. Opp. at 16. Plaintiffs do not explain, let alone allege, why the recordkeeping and quality control deficiencies identified in Cassava's audit of Dr. Wang's

lab, the existence of the May 2020 email from Dr. Burns to Dr. Wang, or exclusions from the Phase 2b cognitive data should have made clear that data fabrication or manipulation occurred. In fact, as explained above, none of the above showed that research misconduct occurred, so it is not even plausible that Defendants would have concluded, based on that "evidence," that "research misconduct" occurred during the Phase 2b study, let alone that Defendants were *severely reckless* for not doing so.

Second, Plaintiffs' scienter theory rests heavily on Defendants' alleged knowledge of the May 2022 email Dr. Burns sent to Dr. Wang. *See id.* at 18–19. Yet Plaintiffs ignore two key facts that were disclosed concurrently: (1) Cassava disclosed that the SEC first brought the potential unblinding issue to the Company's attention *in mid-to-late summer 2024*, and (2) the SEC alleged only *negligence* related to that email. Those facts are not "extraneous," ECF 73 at 19, fn. 16; they negate any inference that Defendants knew, or were severely reckless in not knowing, that earlier statements were false or misleading when made.

Third, Plaintiffs' scienter theory collapses further when examined against the disclosures they challenge. For example, the CUNY Report did not purport to *examine a single allegation related to the Phase 2b study*.[3] Thus, because the challenged disclosures related to the Phase 2b study, Plaintiffs' assertion that Defendants characterization of that Report "was misleading because Defendants knew, or recklessly disregarded, evidence substantiating the CUNY Report allegations" is meaningless. *Id*. at 6. Plaintiffs' theory is that Defendants intentionally misled investors by accurately describing a public document while omitting unrelated information. That is not securities fraud.

---

[3] *See* https://www.science.org/do/10.1126/science.adl3444/full/cuny_wang_final_report-1698701360173.pdf

Finally, Plaintiffs' observation that Defendants raised capital through a warrant sale adds no plausibility to their scienter theory. Opp. at 4–5. Plaintiffs appear to argue that Defendants sought to raise capital to fund clinical trials and advance simufilam—while simultaneously alleging Defendants knew or should have known that the data underwriting those efforts was unreliable. In short, they allege Cassava raised money just to knowingly throw it away. This does not support an inference of fraudulent intent.

In sum, Plaintiffs do not plead contemporaneous knowledge of falsity, severe recklessness, or any cogent motive. When weighed against the far more plausible non-fraudulent inference— that Defendants made accurate disclosures based on the information known at the time while responding to evolving regulatory inquiries—Plaintiffs' scienter theory fails.

## C.    Plaintiffs Do Not Adequately Plead Loss Causation

Plaintiffs' Opposition also confirms their failure to adequately plead loss-causation, as well as the fundamental incoherence in treating this case as distinct from the Consolidated Action. *Dura* makes clear that a plaintiff must plausibly allege a causal connection between the alleged fraud and the economic loss—i.e., that the market learned the truth about a prior misstatement and that revelation caused the stock price decline. 544 U.S. at 342–47 (2005). Fifth Circuit cases recognizing "partial corrective disclosures" do not dispense with this requirement; Plaintiffs must still allege that corrective disclosures revealed the falsity of an earlier challenged statement, not merely that adverse news emerged. *Pub. Emps.' Ret. Sys. of Miss. v. Amedisys, Inc.*, 769 F.3d 313, 320–26 (5th Cir. 2014) (explaining that a corrective disclosure must "reveal to the market the falsity" of prior misstatements).

First, Plaintiffs do not even attempt to align their alleged misstatements with their purported "corrective disclosures." Instead, they recycle the same disclosures already at issue in the Consolidated Action—disclosures that plaintiffs in that case allege corrected *an earlier fraud*.

9

Here, those same events are repurposed to supposedly correct a new set of post–October 2023 statements. This exposes a fundamental problem with the Amended Complaint: the disclosures cannot simultaneously reveal the falsity of two different sets of statements spanning different class periods. Plaintiffs' inability to map any disclosure to any specific misstatement further reveals what is already obvious: this case is not a distinct fraud theory, but a duplicative attempt to relitigate the same alleged fraud under a different caption.

Second, none of the alleged corrective disclosures revealed that any challenged statement was false when made. Instead, they reported new developments unknown to Defendants at the time of the challenged statements—an indictment of a third party, updates on ongoing investigations, and the resolution of regulatory enforcement actions. None of these revelations can be considered "corrective" unless they contradict a prior statement made by Defendants. Plaintiffs don't allege such a contradiction.

Third, the one instance where a disclosure directly addressed a purported misstatement— the February 12, 2025, posting of Phase 2 open-label data on ClinicalTrials.gov—confirms that investors were not misled. That disclosure provided the exact information Plaintiffs say was previously omitted, the alleged exclusions from the dataset. *See* Am. Compl. ¶¶ 63, 102. Yet there was *no stock price decline*; the market did not care.

In short, Plaintiffs plead a chronology of adverse events followed by stock drops, but they do not plead the necessary causal link: that the market learned Defendants' prior statements were false when made.

## CONCLUSION

Because Plaintiffs' Amended Complaint does not and cannot sufficiently plead falsity, scienter, or loss causation, the Court should dismiss the Amended Complaint with prejudice.

Dated: January 21, 2026               Respectfully submitted,

/s/ *Gregg Costa*
Gregg Costa (Tx. Bar No. 24028160)
Trey Cox (Tx. Bar No. 24003722)
**GIBSON, DUNN & CRUTCHER LLP**
811 Main Street, Suite 3000
Houston, TX 77002
Telephone: 346.718.6600
gcosta@gibsondunn.com
tcox@gibsondunn.com

*Counsel for Defendants Cassava Sciences, Inc., Richard Jon Barry, James W. Kupiec, and Eric Schoen*

11

## **CERTIFICATE OF SERVICE**

The undersigned certifies that on January 21, 2026, a true and correct copy of the foregoing was served upon each attorney of record through the Court's CM/ECF system.

/s/ *Gregg Costa*
Gregg Costa
